

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

**TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed December 19, 2007                                         **United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 06-41518-DML-11 |
| | § | |
| Texas Star Industrial Group, Ltd. Co., | § | |
| | § | |
| Debtor. | § | Chapter 11 |
| | § | |

## MEMORANDUM OPINION

Before the court is the Debtor's Objection to Compass Bank's Claim for Post-petition Interest, Fees, and Costs (the "Objection"). The Objection was filed by Texas Star Industrial Group, Ltd. Co. in response to claims of Compass Bank, N.A. ("Compass") for postpetition interest at a default rate pursuant to section 506(b) of the Bankruptcy Code (the "Code"). On October 30, 2007, the court conducted a hearing, during which it heard testimony in support of the Objection.[1]

---

[1] At the hearing, the parties also admitted several exhibits, including the deposition testimony of L. Alan Blakeman, a member and manager of the Texas Star Industrial Group, Ltd. Co., Frank Heuszel, an attorney and accountant with Compass's Special Assets Group, and Damon Stanley O'Neil, Regional President of Compass. Because the Objection and Compass's response constitute contested matters, the record of the entire case is available to the court. *See In re Mirant Corp.*, 348 B.R. 725, 728-29 (Bankr. N.D. Tex. 2006) (citing *Nantucket Investors II v. Cal. Fed. Bank (In re Indian Palms Assocs. Ltd.)*, 61 F.3d 197, 203 (3d Cir. 1995)).

This matter is a core proceeding over which the court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2). This Memorandum Opinion constitutes the court's findings of fact and conclusions of law. FED. R. BANKR. P. 7052 and 9014.

## I. Background

Texas Star Industrial Group, Ltd. Co., a Texas limited liability company, is the debtor ("Debtor") in this chapter 11 case. Debtor owned 4.69 acres of land and four warehouse buildings in Euless, TX (the "Property"). In July of 2003, Debtor entered into the first of two loan transactions (the "First Lien Loan") with Texas Bank, a bank that was later acquired by Compass. In connection with the First Lien Loan, Debtor executed a promissory note, which contains the following relevant terms:

    1. a principal amount of $2.5 million;

    2. an annual interest rate set at the prime rate;[2]

    3. a default rate of interest at 18% per annum; and

    4. a July 11, 2023 maturity date.

Repayment of the First Lien Loan was secured by a deed of trust on the Property, a security agreement and an assignment of tenant leases and rents. The bank also obtained an unconditional guarantee executed by Texas Star's members, David L. Hager ("Hager") and L. Alan Blakeman ("Blakeman").

The second transaction between Debtor and Texas Bank occurred on October 14, 2004 (the "Second Lien Loan" and, together with the First Lien Loan, the "Loans"). The relevant terms of the promissory note for the Second Lien Loan are as follows:

---

[2] Under the terms of the promissory note, the prime rate is determined by the Wall Street Journal, Southwest Edition. However, for the first seven years, the note provides that the rate cannot be less than 4.25% or more than 7.5% per annum.

      1. a principal amount of $200,000;

      2. an annual interest rate set at 1% above the prime rate;[3]

      3. a default rate of interest fixed at 18% per annum; and

      4. an October 14, 2005 maturity date, which was later extended to April 12, 2006.

Repayment of the Second Lien Loan was secured by a deed of trust on the Property, and the bank also acquired an unconditional guarantee executed by Hager and Blakeman.

On April 12, 2006, Debtor was unable to pay the amount owed on the Second Lien Loan, causing Debtor to default.[4] Because a default on the Second Lien Loan was also a default under the terms of the First Lien Loan, Compass notified Debtor of its default on the Loans and posted the Property for foreclosure. To prevent the foreclosure, Debtor filed a voluntary petition for relief under chapter 11 of the Code. At that time, the non-default rate was 7.5% on the First Lien Loan and 8.75% on the Second Lien Loan. Compass filed claims in the amount of $2,320,044.08 based on the First Lien Loan (which included interest and attorney's fees)[5] and $217,424.92 based on the Second Lien Loan.[6] After lengthy negotiation, Debtor agreed to make monthly payments to Compass in the amount of $15,833 in exchange for use of cash collateral.[7]

---

[3] In accordance with the terms of the promissory note for the Second Lien Loan, the prime rate is determined by the Wall Street Journal, Southwest Edition; however, the note provides that the rate cannot be less than 5.75% or more than 18% per annum (the maximum lawful rate in the State of Texas).

[4] While the court is aware of conflicting evidence as to what caused Debtor to default, the court finds evidence indicating Debtor defaulted due to low tenant occupancy and insufficient funds to pay the Second Lien Loan the most credible.

[5] The claim for the First Lien Loan of $2,320,044.08 consisted of $2,288,563.82 in principal, $23,048.92 in interest and $8,431.34 in attorney's fees.

[6] With respect to the Second Lien Loan, the claim for $217,424.92 consisted of $198,199.92 in principal and $19,225 in interest.

[7] The court notes that Debtor's counsel continually referred to these payments as "adequate protection" payments in its pleadings and before the court. On at least one occasion, the court opined that such payments did not constitute adequate protection since Compass was oversecured. *See In re Stembridge*, 394 F.3d 383, 387 (5th Cir. 2004); *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 370 (1988).

**MEMORANDUM OPINION - Page 3**

On January 17, 2007, the U.S. trustee, with court approval, appointed an examiner. Pursuant to section 363 of the Code, Debtor thereafter sold the Property to Bentley Properties, LLC for $3.6 million. Following the sale, Compass was paid $2,363,561.22 on the First Lien Loan (which satisfied the principal amount owed, unpaid interest calculated at the non-default rate of 7.5% and attorney's fees) and $221,521.53 on the Second Lien Loan (which also satisfied the principal amount owed and unpaid interest calculated at the non-default rate of 8.75%).

Debtor now objects to Compass's claims insofar as they include interest above the non-default rates of 7.5% on the First Lien Loan and 8.75% on the Second Lien Loan. In anticipation of the Objection, the court ordered the escrow of $360,464.51 in net proceeds from the sale of the Property. The parties have stipulated that the difference between postpetition interest calculated at the default rate and postpetition interest calculated at the non-default rates equals $230,950. Currently the estate has cash, in addition to the amount held in escrow, equal to approximately $87,027. As for outstanding creditor claims, unpaid administrative expense claims total $238,362.46, non-insider unsecured claims equal approximately $15,953, and insider unsecured claims amount to approximately $58,918.

## II. Discussion

As a preliminary matter, the court notes the parties do not dispute that Compass is an oversecured creditor and has a right to recover postpetition interest, attorney's fees and costs pursuant to section 506(b) of the Code. Indeed, Compass has already received proceeds from the sale of the Property in satisfaction of the principal of the Loans and unpaid postpetition interest (calculated at the non-default rates), as well as attorney's fees. Therefore, the only issue that remains unresolved is whether or not Compass is entitled, pursuant to section 506(b) of the

Code, to postpetition interest calculated at the 18% default rate, and the court limits its discussion to that narrow issue.

It is Debtor's position that the balancing of the equities in this case weighs in favor of the non-default rates, not the 18% default rate. In support of this position, Debtor contends that junior creditors will suffer harm if Compass is paid the default rate. Debtor also argues that, during the course of the bankruptcy, Compass did not suffer any risk of loss but, rather, was protected by its "equity cushion"[8] and the increased supervision over Debtor by the court, the examiner and the U.S. trustee. Along the same line, Debtor points out that Compass benefited from the sale of the Property and, prior to the sale, the $15,833 monthly payments. Debtor also asserts that the spreads between the non-default rates and the default rate are significant.

In response, Compass argues that the 18% default rate should be used to calculate postpetition interest. Compass points out that the 18% default interest rate began accruing on April 12, 2006, almost twenty days before Debtor's chapter 11 petition was filed, and that the default rate is presumed to be applicable. Additionally, Compass offers to subordinate its claim for postpetition default interest to the claims of non-insider unsecured creditors and administrative creditors. Compass contends that, by doing so, all non-insider unsecured creditors and administrative creditors will be paid in full. Compass also asserts that infighting between Hager and Blakeman caused Debtor to default on the Loans and unnecessarily increased administrative expenses.

At the hearing, Blakeman supported Compass's argument that the default rate should be applied. Blakeman contends that, because he executed unlimited guarantees of repayment for the Loans, he will be liable in subsequent litigation for default interest unpaid by the estate.

---

[8] The term "equity cushion" refers to the value of the collateral in excess of the total amount of the secured claims.

**MEMORANDUM OPINION - Page 5**

In relevant part, section 506(b) of the Code states that the holder of an oversecured claim "shall be allowed . . . interest on such claim, and any reasonable attorney's fees, costs or charges . . . ." 11 U.S.C. § 506(b) (2007). Where an oversecured claim arises from a contract extending credit to Debtor, the contract provides the rate of postpetition interest. *Bradford v. Crozier (In re Laymon)*, 958 F.2d 72, 75 (5th Cir. 1992) (stating that, because section 506(b) is silent as to the applicable rate of interest, the courts should defer to the pre-Code practice of using the contract rate when allowing an oversecured creditor to collect postpetition interest). As to what interest rate should apply, there is a presumption in favor of the default rate, unless the court determines the higher rate would produce an inequitable result upon a balancing of the equities. *Southland Corp. v. Toronto-Dominion (In re Southland Corp.)*, 160 F.3d 1054, 1060 (5th Cir. 1998).

When balancing the equities, courts have consistently taken into account, *inter alia*, whether: (1) the creditors junior to the secured creditor will be harmed or impaired if the default rate of interest is paid; (2) the secured creditor faced increased risks during the bankruptcy proceeding; (3) the spread between the non-default rate and the default rate is significant; and (4) the secured creditor obstructed the reorganization process. *See Cunningham v. Am. Automatic Sprinkler, Inc. (In re Trinity Meadows Raceway, Inc.)*, 252 B.R. 660, 668-69 (Bankr. N.D. Tex. 2000). The most important factor is whether junior creditors will be harmed or impaired if postpetition interest is paid at the default rate. *In re Process Property Corp.*, 327 B.R. 603, 609 (Bankr. N.D. Tex. 2005).

Many courts, including this one, have addressed this issue in other similar cases, and the court now looks to these cases in deciding what rate of postpetition interest applies in this case. *See Southland Corp.*, 160 F.3d at 1060 (ruling the default rate was proper where the spread between the non-default rate and the default rate was just 2%, the creditor banks did not obstruct Debtor's reorganization, and no junior creditor would have been harmed or impaired by applying

the default rate); *In re Cummins Util., L.P.*, 279 B.R. 195, 202-03 (Bankr. N.D. Tex. 2002) (holding the non-default rate was proper where the creditor banks did not charge the default rate until the bankruptcy case commenced, the creditor banks did not give notice before applying the default rate, the creditor banks were not exposed to an increased risk, and the unsecured creditors would have been harmed if the default rate were applied); *In re Trinity Meadows Raceway, Inc.*, 252 B.R. at 668-69 (concluding the non-default rate was the proper postpetition interest rate where the spread between the non-default contract rate and default rate was 10%, and other creditors would have been harmed if the default rate were allowed); *In re Maywood*, 210 B.R. 91, 93 (opining the non-default rate was proper because the lender received full repayment of its loan from the debtor, and it was unclear whether the unsecured creditors would receive any distribution.[9]

Applying the equities to the case at bar, the court concludes that junior creditors would be harmed if the 18% default rate were allowed. The estate includes cash in the estimated amount of $447,491.51.[10] Application of the default rate would reduce such proceeds to $216,541.51.[11] Because administrative claims and unsecured claims total approximately $313,233.46,[12] there are insufficient funds to pay all creditors junior to Compass's oversecured claims if the default rate was applied. While Compass is prepared to voluntarily subordinate its claims to those held by

---

[9] This court has found cause to award the default rate when it was a bargained for term of the contract, the debtor defaulted prior to the bankruptcy case, and, unlike in the case at bar, no junior creditor was harmed or impaired by its application. *See In re Delaney Family, L.P.*, 51 Collier Bankr. Cas. 2d 1665, 1671 (2003) (No. 02-46631-DML-11), 2003 WL 23957146.

[10] The $447,491.51 figure is the sum of $360,464.51 from the Property sale held in escrow plus $87,027 in estimated cash held by Debtor.

[11] The $216,541.51 figure comes from $447,491.51 in estate proceeds less $230,950 (the stipulated difference between postpetition interest calculated at the original contract rate and postpetition interest calculated at the default rate).

[12] The $313,233.46 amount equals the sum of $238,362.46 in administrative claims, $15,953 in non-insider unsecured claims and $58,918 in insider unsecured claims.

**MEMORANDUM OPINION - Page 7**

non-insider unsecured creditors and administrative creditors,[13] doing so does not protect insider unsecured claims from impairment or harm, and the court has no reason to distinguish insider claims from non-insider claims based solely on the fact the unsecured claims are insider claims. *See Robertson v. Pierce (In re Huang)*, 23 B.R. 798, 802 (B.A.P. 9th Cir. 1982) (ruling that disallowance of unsecured claim was not proper merely because unsecured creditor was an insider); *In re Missionary Baptist Foundation*, 818 F.2d 1135, 1143 (5th Cir. 1987) (providing the fact an unsecured creditor was an insider was an insufficient ground for subordination absent a substantial factual basis to support allegations of impropriety).[14] Distinguishing insider claims as proposed by Compass in order to pay Compass a premium rate of interest would be tantamount to their equitable subordination without the requisite showing but rather by category. *See In re Mobile Steel*, 563 F.2d 692 (5th Cir. 1972); *cf. United States v. Noland*, 517 U.S. 535 (1996). In stark contrast, application of the non-default rates would provide all junior creditors with full payment of their claims.

Turning next to the question of whether Compass faced any increased risks during the bankruptcy proceeding, the court concludes it did not. Though the claims of Compass totaled $2,537,469,[15] there was little threat that Compass would become undersecured because its claims were secured by the Property with an "equity cushion" of approximately $1 million.[16] As for expenses, Compass ultimately did not suffer any expense at all. The principal of the Loans,

---

[13] Compass has indicated it will subordinate its claims if it receives the 18% default rate.

[14] The court notes that several sections of the Code expressly provide for different treatment of insiders. *See* 11 U.S.C. §§ 303(b)(2), 502(b)(4), 523(a)(2), 547(b)(4), 550(c), 702(a)(3), 727(a)(7), 741(1), 1104(c)(2) and 1129(a)(10). No provision of the Code distinguishes insider from non-insider claims in a context comparable to the issue now before the court. Moreover, distinguishing between insider creditors from non-insider creditors was not a pre-Code practice under § 63a(4) of the Bankruptcy Act. *See* 3A COLLIER ON BANKRUPTCY ¶ 63.23 (14th ed. 1975); *In re Laymon*, 958 F.2d at 75.

[15] Compass had claims of $2,320,044.08 on the First Lien Loan and $217,424.92 on the Second Lien Loan.

[16] Accepting the sale as establishing the value of the Property, Compass had an "equity cushion" of $1,062,531 ($3.6 million from the sale of the Property less Compass's claims of $2,537,469).

**MEMORANDUM OPINION - Page 8**

Compass's attorney's fees and all of Compass's postpetition interest (calculated by the non-default rate) were paid from the proceeds of sale of the Property. The bankruptcy case also gave Compass increased bargaining power, of which Compass took advantage. By negotiating with Debtor for use of cash collateral, Compass obtained an agreement with Debtor whereby Compass received monthly payments of $15,833 from July 2006 to June 2007 totaling approximately $189,996. By reason of these payments, the Loans were earning assets for Compass. Compass also benefited from the increased oversight of Debtor. From the time the bankruptcy case was filed, Debtor, as debtor-in-possession, had a fiduciary duty to manage and maintain the estate with the interest of creditors as its primary concern, and Debtor's activities were carefully scrutinized throughout the duration of the case by the court and the U.S. trustee. Appointment of an examiner also provided protection, and so benefit, to Compass. *See Process Property*, 327 B.R. at 608; *Cummins Utility*, 279 B.R. at 202. Moreover, Hager's efforts in managing the Property during the case improved Compass's position by increasing occupancy and maintaining the Property.

With respect to the spreads between the non-default rates and the default rate, the court finds the spreads in this case are significant. At the time the bankruptcy case was filed, the non-default rate for the First Lien Loan was 7.5%, and the non-default rate for the Second Lien Loan was 8.25%. Both Loans had a default rate of 18%. Thus, the spreads between the non-default rates and the default rate are approximately 10%.[17]

As for obstruction, Debtor concedes that Compass did nothing to obstruct the reorganization process in this case, and the court agrees. However, in an interesting twist, Compass argues that Hager and Blakeman's infighting unnecessarily caused Debtor to default

---

[17] To be precise, the spread for the First Lien Loan is 10.5% per annum, and the spread for the Second Lien Loan is 9.75% per annum.

**MEMORANDUM OPINION - Page 9**

and increase administrative expenses, and, thus, the court should decide that applying the default rate is not inequitable. The court finds this argument is not persuasive. Although the court notes there is conflicting testimony concerning the cause of Debtor's default, the court finds that Debtor's low tenant occupancy and lack of funds to make its loan repayment to be the most credible explanation, not infighting between Debtor's members.

Finally, the possibility that Blakeman, as guarantor, may be held liable in subsequent litigation for unpaid interest at the default rate, though arguably a factor, should be given little weight due to the uncertainty of a subsequent trial court's decision.[18] As the court concludes that the non-default rate is proper in this case, it may be that any court determining Blakeman's liability to Compass will arrive at the same result.

### III. Conclusion

Upon consideration of all the equities and the facts before it, the court declines to apply the default rate to calculate postpetition interest. Though default interest, prior to the commencement of the bankruptcy case, came as no surprise to Debtor, as it was a bargained for term of the Loans, application of the default rate postpetition would harm and impair junior creditors to the further benefit of Compass. The Objection is therefore SUSTAINED.

##END OF OPINION##

---

[18] Any attempt by this court to decide future litigation regarding the effect of its decision is beyond its jurisdiction. *See In re Gonzalez*, 372 B.R. 837, 843 (Bankr. W.D. Tex. 2007) (citing *In re Thickstun Bros. Equip. Co., Inc.*, 344 B.R. 515, 519 (6th Cir. B.A.P. 2006)). However, the court believes the issue itself should be given some weight when balancing the equities.

**MEMORANDUM OPINION - Page 10**